UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PRL USA HOLDINGS, INC.,

                  **Plaintiff,**

-against-

UNITED STATES POLO ASSOCIATION,
INC., USPA PROPERTIES, INC. and JRA
TRADEMARK COMPANY, LTD.,

                  **Defendants.**

---

**14 CV**      **764**

14-Civ. _____



FEB 06 2014

U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

      Plaintiff PRL USA Holdings, Inc. ("PRL"), by its attorneys, Kelley Drye &
Warren LLP, brings this action against Defendants United States Polo Association, Inc., USPA
Properties, Inc. (collectively "USPA") and JRA Trademark Company, Ltd. ("JRA")
(collectively, "Defendants"), and alleges as follows:

### I.    THE PARTIES

      1.    Plaintiff PRL is a corporation organized and existing under the laws of Delaware.
It is a wholly-owned subsidiary of Ralph Lauren Corporation ("RLC") and has its principal place
of business at 625 Madison Avenue, New York, New York, 10022.

      2.    Defendant United States Polo Association, Inc. is a not-for-profit corporation
organized and existing under the laws of Illinois, with its principal place of business at 9011
Lake Worth Road, Lake Worth, Florida, 33467.  United States Polo Association, Inc. purports to
be the governing body for the sport of polo in the United States.

      3.    Defendant USPA Properties, Inc. is a corporation organized and existing under
the laws of Illinois, with a principal place of business at 771 Corporate Drive, Suite 430,

Lexington, Kentucky 40503. USPA Properties, Inc. is a for-profit company that acts as the licensing arm of United States Polo Association, Inc. and is engaged in licensing USPA branded products, both domestically and abroad. USPA Properties, Inc. is a wholly-owned subsidiary of United States Polo Association.

4.  Defendant JRA is a corporation organized and existing under the laws of the State of New York, with a principal place of business at 1400 Broadway, New York, New York 10018. Since 1998, JRA, a subsidiary of Jordache Enterprises, Inc., has been the master licensee for USPA's trademarks in North America, and has manufactured and sold various products bearing USPA trademarks. JRA is also the exclusive operator of USPA stores in the United States.

## II.    JURISDICTION AND VENUE

5.  Plaintiff PRL brings this action, *inter alia*, for contempt of certain orders entered by this Court, and for recovery under the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051 et seq. (the "Lanham Act"), and the laws of the State of New York, including § 360-1 *et seq.* of the New York General Business Law, against Defendants, *inter alia*, for willful infringement of Plaintiff's trademarks, unfair competition and false designation of origin or sponsorship, and trademark dilution and disparagement.

6.  This Court has jurisdiction, *inter alia*, pursuant to Section 39 of the Lanham Act, 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338 over causes of action arising under the Lanham Act, and pursuant to 28 U.S.C. § 1338 and 1367 over causes of action created by the laws of the State of New York.

7.  Defendants conduct business within this judicial district, including, but not limited to, the operation of retail stores in the district and sale of merchandise in this district.

8.      Venue is proper under 28 U.S.C. § 1391 in that Defendants conduct business in this district, and a substantial portion of the activity of which Plaintiff complains took place in this district, and Defendants are subject to personal jurisdiction in this district.

## III.   THE FAMOUS PRL MARKS

9.      In the 1960s, fashion designer Ralph Lauren created and brought to international prominence a lifestyle family of brands, built around several trademarks including the POLO mark and the iconic logo shown here (the "Polo Player Logo") (collectively, the "PRL Marks"):



10.     RLC, PRL, and their affiliated companies and predecessors-in-interest have been using the PRL Marks in connection with the promotion and sale of goods and services, including a wide range of premium lifestyle products, including men's, women's, and children's apparel, footwear and headgear, eyewear, watches, jewelry, bags and leather accessories, fragrances, home goods, textile goods, lighting, furniture, and services, including retail store services (collectively, "RLC Products") in the U.S. and many other countries since as early as 1967.

11.     Plaintiff, RLC, and its affiliate companies use the PRL Marks to promote and sell products in approximately 350 retail stores and more than 500 concession shop locations worldwide, and in most major department stores in the United States and many other countries around the world.  RLC Products bearing the PRL Marks are also promoted and sold on RLC's e-commerce websites, including at www.polo.com, and via many other e-commerce sites in the United States and around the world.  RLC and its subsidiaries expend significant resources to advertise, market, and promote RLC Products bearing the PRL Marks, and receives widespread

3

media attention worldwide, including extensive and consistent recognition for the high quality of RLC Products.

12.     RLC and its subsidiaries own all rights and interests in a number of trademarks, including rights in the PRL Marks in connection with the RLC Products, and corresponding trademark registrations in 136 countries and territories, including the U.S.  PRL is the exclusive owner of the rights in the PRL Marks in connection with the RLC Products in the U.S., including numerous U.S. trademark and service mark registrations.  A list of some of the U.S. trademark registrations for the PRL Marks is attached hereto as Exhibit A.

13.     As a result of the longstanding use, promotion, and media attention associated therewith, the PRL Marks are among the most highly recognized marks in the world, which consumers recognize as an identifier of RLC Products.  In fact, many consumers worldwide know RLC simply as "POLO."  As early as 1978, a federal court held that the PRL Marks had acquired distinctiveness in the minds of consumers as a source identifier and were unquestionably strong marks.  The PRL Marks have been included in rankings of the world's most valuable and recognizable trademarks.  Indeed, as of November 2013, Forbes listed Ralph Lauren and the Polo Player Logo among a list of 100 "World's Most Valuable Brands." (Available at www.forbes.com/powerful-brands/list, last visited on February 5, 2014).

## IV.     **PRIOR LITIGATION BETWEEN THE PARTIES**

14.     USPA maintains that it was established to promote the sport of polo in the United States.  It is clear, however, that at this time USPA's main focus is that of a profit-making enterprise to sell apparel and related goods worldwide.  Indeed, as documented in numerous U.S. court proceedings, the USPA and the other Defendants have made a business out of attempting to trade on the worldwide fame of the PRL Marks and other famous trademarks via the sale of

competitive products. Plaintiff has therefore had to continually defend its rights against infringement by USPA and its licensees.

15.    Defendants have repeatedly been found guilty of free-riding on the goodwill of the PRL Marks by this Court. Undaunted by prior court rulings, as set forth herein, Defendants continue to find new ways to unfairly trade on the PRL Marks and brand identity, such as altering the presentation of its logos, modifying its branding execution to come closer and closer to the PRL Marks, and expanding its use of logos and marks in connection with new categories of goods and services. Thus, Defendants' actions have encroached, and will continue to progressively encroach, upon PRL's rights unless Defendants are once again restrained by this Court.

16.    Moreover, an important public policy consideration underlying trademark law is the protection of consumers against confusing or deceptive trademarks, such that consumers may properly identify the source of goods and services they purchase. It is therefore also in the public interest that the Court stop Defendants' unlawful activities.

### A.    The 1984 Litigation And Resulting Injunction

17.    USPA began selling products in the early 1980s. At that time, USPA characterized itself as a not-for-profit corporation governing the sport of polo in the United States. Its activities allegedly included promulgating and revising rules for the sport, maintaining handicaps of its polo playing members, and organizing and conducting tournaments.

18.    In 1984, the USPA brought its first declaratory judgment action against PRL. USPA claimed that, as the governing body of the sport of polo, it was entitled to, among other things, use a mounted polo player logo in connection with the sale of its goods. The mounted polo player logo being used by the USPA in 1984 was strikingly similar to the Polo Player Logo that PRL had already been using for more than a decade.

19.     PRL counterclaimed for trademark infringement.  By order dated December 6,

1984 (the "1984 Order"), Judge Leonard B. Sand found that USPA's use of a polo player mark

on merchandise, hang tags and packaging, infringed the marks POLO, POLO BY RALPH

LAUREN, and the Polo Player Logo (collectively referred to by Judge Sand as the "Polo

Marks") then owned by Polo Fashions, Inc., a predecessor of PRL.  *U.S. Polo Ass'n, Inc. v. Polo*

*Fashions, Inc.*, No. 84 Civ. 1142, 1984 WL 1309 (S.D.N.Y. Dec. 6, 1984).  The 1984 Order

included a broad injunction that enjoined USPA from, among other things:

- using any of the Polo Marks or any name or mark or symbol which is confusingly similar thereto, in connection with the sale or offering for sale of any goods or the rendering of any services;

- manufacturing, distributing, advertising, promoting, importing, licensing, authorizing, sponsoring, holding for sale or selling any goods, labels, tags, logos, decals, emblems, signs and other forms of markings, any packaging, wrappers, containers and receptacles and any jacquard cards, catalogs, price lists, promotional materials and the like bearing an infringement or colorable imitation of any of the Polo Marks;

- using for any commercial purposes whatsoever any symbol, logo, trade name or trademark which may be calculated to or has the effect of falsely representing that the services or products of or licensed by plaintiffs are sponsored or authorized by, or in any was associated with defendants, Ralph Lauren or any entity affiliated with any of them; and

- using for any commercial purposes whatsoever, the name "United States Polo Association," or any other name which emphasizes the word POLO (or the words U.S. POLO) separate, apart and distinct from such name in a manner which is likely to cause confusion with defendants, Ralph Lauren or any entity affiliated with any of them.

*See* Ex. B, ¶ 8.

20.     Judge Sand noted that even if USPA began its licensing program with a *bona fide*

interest in promoting the sport of polo, that did not allow USPA or its licensees to compete

unfairly against or infringe the PRL Marks and act in a manner "which appears so obviously to

be an attempt to emulate" the Polo Marks.  1984 WL 1309 at *10.

**B.**     The 2000 Apparel Litigation and Resulting Injunction

21.     After the 1984 Order, USPA continued its licensing program.  In 1998, USPA

began working with JRA's parent company, Jordache Enterprises ("Jordache"), as its licensee for

clothing.  Upon information and belief Jordache developed a clothing line featuring, among other

things, several different versions of a mark consisting of two polo players mounted on horses:



This mark, and each of these versions of the mark, are referred to collectively as the "Double

Horsemen Mark."

22.     PRL brought a trademark infringement action in July 2000 in the Southern

District of New York against multiple defendants including USPA and Jordache, Ltd., L.V.

Enterprises, Inc. based on the sale of apparel and related products incorporating certain USPA

marks and logos that infringed the PRL Marks, including the Double Horsemen Mark.  *PRL USA*

*Holdings, Inc. v. U.S. Polo Ass'n*, No. 99 CV 10199 (GBD).  The products at issue in the

litigation included those that fall within Class 14 (solely limited to watches), Class 18, Class 25,

and Class 28 (solely limited to products that pertain to the sport of polo) of the International

Classification of Goods and Services for the Purposes of the Registration of Marks[1] (these

products are collectively referred to herein as the "Specified Products").

---

[1] International Classification of Goods and Services for the Purposes of the Registration of Marks ("International Class Schedule") classifies goods and services into 35 separate classes. The schedule is established by the Committee of Experts of the Nice Union and used by trademark offices around the world to categorize applications to register trademark rights by uniform product and service categories.

23.     On September 5, 2003, before trial in the action, PRL, USPA and the Jordache companies, including JRA, entered into a settlement agreement (the "Settlement Agreement") that resolved certain, but not all, issues outstanding in the litigation.  Specifically, the Settlement Agreement did not resolve the parties' dispute with regard to the use of the mark "United States Polo Association" or certain variations thereof on the Specified Products.  The Settlement Agreement also did not address the parties' promotion, sale, or respective uses of any trademarks, names or logos in connection with categories of products or services other than the Specified Products, such as products and services covered by other classes described in the International Class Schedule.  The Settlement Agreement also did not resolve PRL's claims relating to the four versions of the Double Horsemen Mark as reflected in paragraph 21, *supra*. Instead, the parties agreed that the resolution of those claims would be determined at trial, and that, to the extent the jury determined that any of the four versions of the Double Horsemen Mark were non-infringing, those approved versions would be retroactively integrated into the Settlement Agreement.

24.     In October 2005, a jury found that the USPA's use of a solid Double Horsemen Mark (as shown below and hereafter referred to as the "Solid Double Horsemen Mark") in connection with promotion and sale of Specified Products infringed the PRL Marks:



25.     The jury also found that USPA's then use of the three remaining versions of the Double Horsemen Mark set forth below in connection with promotion and sale of the Specified Products did not infringe the PRL Marks.

8

  

26.     On October 31, 2005, Judge Daniels issued a Final Order and Judgment (the

"2005 Judgment") consistent with the jury verdict. A copy of the 2005 Judgment is attached

hereto as Exhibit C. Among other things, the 2005 Judgment provides that, with respect to the

Specified Products:

> The USPA and the Jordache Parties and any of their respective
> subsidiaries, affiliates, officers, agents, licensees, employees,
> attorneys, and all persons in active concert or participation with
> each of them are thereby permanently enjoined from making any
> such use of the "[S]olid [D]ouble [H]orsemen" [M]ark.

Ex. C, ¶ 1 (emphasis added).

**C.      The 2009 Fragrance Litigation And 2012 Injunction**

27.     USPA's ongoing infringement of the PRL Marks and its efforts to capitalize on

PRL's reputation and goodwill has resulted in additional litigation. In 2009, USPA sought to

expand into the fragrance market and licensed to JRA the right to sell fragrances bearing the

Double Horsemen Mark. Fragrance as a category of the International Class Schedule was not

covered by the Settlement Agreement or any prior court decision.

28.     In November 2009, USPA filed a complaint against PRL seeking a declaratory

judgment that, among other things, it had the right to use the Double Horsemen Mark in

connection with fragrances and other personal care and beauty products. PRL and its fragrance

licensee, L'Oreal USA, Inc., which intervened in the action, asserted counterclaims, and sought

9

an injunction barring USPA's use of the Double Horsemen Mark.  An example of the proposed

USPA fragrance product is depicted as follows:



29.    On May 13, 2011, following a bench trial, the District Court issued its opinion

finding that the parties' Settlement Agreement did not entitle USPA to use the Double Horsemen

Mark in the fragrance category, and that USPA's use of the Double Horsemen Mark on a

fragrance product, and of composite word marks in which the word POLO predominated,

infringed the PRL Marks.  *U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp.2d 515

(S.D.N.Y. 2011).  The Court found the PRL Marks were "extremely strong" and thus entitled to

a substantial degree of protection from infringement.  *Id.* at 527-28.  The Court also held that the

striking similarities between PRL's Polo Player Logo and USPA's Double Horsemen Mark as

used in that case were "apparent."  *Id.* at 528.  In particular, the Court noted:

> Both marks are similar in perspective—containing a polo player on
> horseback, facing slightly to the viewer's left, leaning forward with
> a polo mallet raised.  Both are monochrome logos that are similar
> in their level of abstraction.  Both are displayed in embossed
> metallic or glossy material—with PRL's appearing in a number of
> colors including silver and gold, and USPA's appearing in a light
> gold.
>
> The primary difference between the marks is that the PRL's logo
> contains one player, while USPA's contains two, one with mallet
> raised and the other with mallet lowered, which significantly
> overlap.  In USPA's mark, the front horseman is displayed in solid
> metallic ink, while the rear horseman is only outlined, such that the

> background packaging shows through. **This gives the front—
> mallet raised—horseman more visual prominence, while the
> torso of the rear horseman can be said to fade into the
> background. Both of USPA's horsemen share the same
> directional perspective and overlap to a degree that it can be
> difficult to discern if there is one horse or two.**

*Id.* at 528-29 (citations omitted and emphasis added). The court also found that USPA acted in

bad faith in using the Double Horsemen Mark:

> USPA was undoubtedly fully familiar with the PRL Parties' marks
> and trade dress . . . . USPA's intent to capitalize on PRL's
> reputation and good will can be inferred from its decision to adopt
> a mark that is so strikingly similar to the PRL Polo Player Logo . . .
> . USPA could have avoided this situation entirely by choosing a
> logo that depicts a polo player in a position and from a perspective
> that differs from the Polo Player Logo . . . . But it chose not to do
> so.

*Id.* at 536.

30.     The District Court entered a Final Judgment and Permanent Injunction on March

5, 2012 (the "2012 Injunction"). The 2012 Injunction is attached hereto as Exhibit D. Among

other things, the 2012 Injunction enjoins and restrains USPA from:

- Using the Double Horsemen Mark . . . alone or in combination with any name,
  symbol, device or other word(s) in connection with the advertising, promotion,
  offering for sale or sale of fragrances or related products such as cosmetics,
  personal care products and beauty products;

- Using the word "POLO" alone or in combination with any name, symbol, device
  or other word(s) in connection with the advertising, promotion, offering for sale
  or sale of fragrances or related products such as cosmetics, personal care products
  and beauty products;

- Using the PRL marks or any other name or mark, including the image of one or
  more mounted polo players, that constitutes a colorable imitation of or is
  confusingly similar to PRL's Polo Player Logo . . . or "POLO" word mark **in
  connection with the sale or offering for sale of any goods or rendering of any
  services**;

- Using for any commercial purpose whatsoever any symbol, logo, trade name,
  trademark, or trade dress which is calculated to or has the effect of representing
  that the products or services of or licensed by the USPA are associated with,

11

sponsored, endorsed, or authorized by, or are in any way connected or associated with the PRL Parties or any entity affiliated with them.

Ex. D, ¶ 3 (emphasis added).

31.    USPA appealed the May 2011 opinion, and the U.S. Court of Appeals for the Second Circuit affirmed the opinion in its entirety in February 2013. *U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 511 Fed. Appx. 81 (2d Cir. 2013). Among other things, the Second Circuit observed that in light of "USPA's history of infringement and the district court's finding of bad faith," USPA has "[a]n obligation . . . to maintain a safe distance from infringing [PRL's] marks." *Id.* at 85.

### D.    The 2012 Contempt Proceedings And 2013 Order Regarding Sunglasses

32.    Following the 2012 Injunction, and in response to USPA's flagrant disregard of that order, PRL brought a motion for contempt and sanctions based on USPA's sale of sunglasses bearing the Double Horsemen Mark. Such use of the Double Horsemen Mark on sunglasses, which are in a product category of the International Class Schedule also not covered by the Settlement Agreement, was in direct violation of the 2012 Injunction and the 1984 Order.

33.    In 2012, Defendants were selling several different styles of sunglasses bearing the Double Horsemen Mark through national retail locations, including Kohl's, TJ Maxx, Burlington Coat Factory, and Ross Stores, as well as USPA outlet stores. In some instances, the Double Horsemen Mark used by USPA was imprinted on glasses in such a way that it was impossible to distinguish between the two horsemen or, in fact, to tell whether it was one horsemen or two. USPA continued selling these goods after the 2012 Injunction was issued, despite the fact that they were enjoined from selling any such products by the plain terms of the 2012 Injunction.

34.    By order dated March 5, 2013, Judge Sweet granted PRL's motion holding USPA in contempt of the 2012 Injunction. This Court ordered USPA to cease all sale of the sunglasses

bearing the Double Horsemen Mark within 60 days and to turnover future profits resulting from any sales of sunglasses bearing the infringing Double Horsemen Mark thereafter (the "2013 Order"). Judge Sweet found, among other things, that:

- The Double Horsemen Mark being used on USPA sunglasses was "virtually identical to" the Double Horsemen Mark that had been enjoined with respect to fragrances;

- The 2012 Injunction was clear and unambiguous;

- The 2012 Injunction required USPA to use a distinctively different mark from PRL's Polo Player Logo on any goods or the rendering of any services (with the exception of any conduct found to be non-infringing by the 2005 Judgment); and

- The USPA had not complied with the 2012 Injunction because PRL showed "by clear and convincing evidence that the Double Horsemen Mark, which the USPA is using on its sunglasses, packaging and attached tags, is a simulation and colorable imitation of the Polo Player Logo prohibited by the Injunction."

35.     Judge Sweet found that the provisions of his 2012 Injunction are similar to the injunctive provisions of the 1984 Order, especially "with respect to provisions against the USPA's expansion of the use of the infringing marks to other items," and that both the 2012 Injunction and the 1984 Order "sought appropriately to eliminate the source of future controversy between the parties."  The 2013 Order is currently on appeal to the U.S. Court of Appeals for the Second Circuit.

## V.     DEFENDANTS' INFRINGING USE OF THE DOUBLE HORSEMEN MARK IN CONNECTION WITH RETAIL STORE SERVICES

36.     Defendants have recently begun use of the Double Horsemen Mark in connection with yet another category of services not covered by the Settlement Agreement, in direct violation of the 2012 Injunction and the 1984 Order.  In particular, Defendants have begun using the Double Horsemen Mark as a brand identifier in connection with the promotion and operation of full-priced retail stores located in prime high-end retail locations, and in connection with

online e-commerce retail stores selling a wide variety of merchandise directly to the consumer via the internet ("Retail Store Services").

37.     Class 35 of the International Class Schedule includes, among other things, the provision of retail store services.  Retail store services as a category included in the International Class Schedule includes the enterprise of bringing together a variety of goods for the purpose of allowing consumers to view and purchase such goods.  Such services may be provided via retail stores, e-commerce websites, or mail order catalogs.  For example, TARGET brand stores use the well-known Bull's Eye logo in connection with promotions, websites, and store signage, to identify their retail stores, in which it sells a variety of different goods to consumers.

38.     While the Settlement Agreement and 2005 Judgment might allow Defendants to use certain versions of the Double Horsemen Mark on the Specified Products, it does not allow their use of the Double Horsemen Mark as a brand identifier for the operation of retail stores and e-commerce websites which promote and sell products direct to consumers.

39.     As with the fragrance and sunglasses product categories, Defendants' Retail Store Services are not covered by the parties' Settlement Agreement.  Examples of Defendants' use of the Double Horsemen Mark in connection with Retail Store Services are attached hereto as Exhibits E and F.

40.     By using the Double Horsemen Mark in connection with Retail Store Services, Defendants intend to, and do, cause confusion and deceive the public, and take advantage of the good will associated with the PRL Marks, in willful disregard of PRL's rights.  Defendants' activities are likely to lead to and result in consumer confusion, mistake, and/or deception, and are likely to cause consumers and the public to believe that PRL has produced, sponsored, authorized, licensed or otherwise approved Defendants' Retail Store Services.  In addition,

Defendants' use of the Double Horsemen Mark in connection with Retail Store Services is a clear violation of the 2012 Injunction.

A.    **The USPA Flagship Retail Store Opens In Times Square**

41.    In 2013, Defendants began utilizing various presentations of the Double Horsemen Mark to heavily advertise a new retail store located in the prime retail district of Times Square in Manhattan, New York. The store's grand opening was on April 26, 2013. This store, which is billed by USPA as its "flagship" store, marked USPA's entry into full-priced retail operations located in high profile and centrally located shopping districts. Upon information and belief, until this store opened, USPA's only stores in the U.S. were off-price factory outlets located in outlet malls and similar lower-end retail locations. When the Times Square store opened, USPA specifically distinguished the Times Square store from its outlet stores by categorizing it separately on the USPA website, and by promoting the opening of the store to the general consumer on social media and via other promotional vehicles.

42.    In October 2013, it was reported that USPA had signed a 10-year lease for the Times Square space. In an article called "Polo Association Scores Broadway Flagship" dated October 25, 2013, *Real Estate Weekly* reported that Times Square is a "powerhouse location" that "is considered gold-plated for retailers." The same article noted that the USPA Times Square store "is predicted to be the highest grossing retail store per square foot in the world."

43.    Defendants are using the Double Horsemen Mark as a source identifier for its Times Square store and rely heavily on the Double Horsemen Mark in its promotion of the store. For example, the Double Horsemen Mark appears on banners, signs, advertisements, and other promotional and marketing materials related to the store. Prior to the store opening, USPA promoted the store on social media, including an advertisement on its Facebook account announcing the Times Square store was "Coming Soon" and featuring the Double Horsemen

15

Mark with the words "U.S. Polo Assn." below it.  USPA also heavily promoted the store through its Twitter account, @uspoloassn, using the Double Horsemen Mark as its profile picture. Defendants created highly stylized videos to promote the opening of the new "flagship" store in Times Square, and displayed the videos on YouTube and other websites.  Defendants also used the Double Horsemen Mark to promote the store opening on outdoor advertising in New York City.

44.     Above the entrance to the Times Square store, there is a massive billboard featuring a dark green leafy background and the Double Horsemen Mark in white, with "USPA" below it.  Consumers enter the store through glass doors featuring an opaque white Double Horsemen Mark at eye level, and the floor covering in the entryway also features the Double Horsemen Mark.  Examples are attached hereto as Exhibit E.

**B.     USPA's Retail Store In New York City's Exclusive SoHo Shopping District**

45.     In or around November 2013, Defendants opened their second full-priced retail store in an upscale shopping district of New York City.  This store is centrally located at 487 Broadway in the SoHo neighborhood of lower Manhattan.  SoHo is an upscale shopping area featuring high-end designer boutiques, including among many others, Prada, Chanel, Louis Vuitton, Versace, and Balenciaga.  The USPA store is located only six blocks from Ralph Lauren's existing store in SoHo at 109 Prince Street.  Three Double Horsemen Marks are predominantly featured in signage above the entrance to the USPA's SoHo store.  A Double Horsemen Mark is also predominantly featured in each of the store windows.  Sample images of the exterior of the SoHo store are attached hereto as Exhibit F.

46.     The SoHo store displays and sells a wide variety of apparel, including dress shirts, handbags, hats, coats, sweaters and home goods.  The interior aesthetic of the store evokes an upscale American lifestyle fashion brand, including dark wood frames displaying images of

16

young people outdoors engaged in sporting activities. There is also a large feature image on the back wall of the store depicting young men and women posed with an American Flag in the outdoorsy affluent setting of a ski lodge, which intentionally mimics the all-American, high-end and sporty promotional aesthetic associated with Plaintiff's POLO brand and PRL Marks. The use of such aesthetic, together with the predominant use of the Double Horsemen Mark, is clearly intended to trade on the good will associated with the PRL Marks and brand identity.

### C. USPA Launches Its Own E-Commerce Website

47.    Upon information and belief, in or about August 2013, Defendants first began providing online Retail Store Services, selling products directly to consumers through USPA's own e-commerce website. USPA products were previously only available for purchase online sporadically through the websites of lower-tier retailers including Sears.com and Kohls.com.

48.    The USPA e-commerce site, located at www.uspoloassn.com, also demonstrates its overall intent to capitalize on the PRL Marks and brand identity. USPA's website purports to market itself as a high-end fashion company. USPA's e-commerce site features the Double Horsemen Mark as a banner on the top of nearly every page. In addition, the USPA website features a white background with navy blue headings on the top of the page – imitative of the design of the Ralph Lauren website.

49.    USPA's website also uses the Double Horsemen Mark as a "favicon," a website icon which appears on the internet browser address bar next to the web address to identify the website, and next to the website name in an internet user's list of bookmarked websites. The Defendants' favicon on www.uspoloassn.com appears to the left of the URL address, as well as on the "Favorites" bar and browser tab, as shown below.

17



The favicon for the USPA e-commerce site is a replica of the Polo Player Logo favicon used to identify PRL's e-commerce websites, such as those located at www.polo.com and www.ralphlauren.com, shown to the left of the URL address, below, as well as on the "Favorites" bar and browser tab.



A side-by-side comparison of the favicons shown below demonstrates that they are virtually identical.



50.     Defendants have also recently begun advertising on dedicated internet and social media websites including Instagram, Pinterest, Twitter, Facebook, and Vimeo, and on a dedicated "official" USPA YouTube channel, located at www.youtube.com/user/USPoloAssnTV (last visited on February 5, 2014).  The YouTube site features the Double Horsemen Mark on a

banner at the top of the page.  Like the USPA website, these videos attempt to portray USPA

clothing bearing the Double Horsemen Mark as a high-end lifestyle brand, in an obvious attempt

to capitalize on PRL's reputation and cause consumer confusion.  The videos feature fashion

"photo shoots" of groups of young models posing and frolicking in USPA clothing which

predominately bear the Double Horsemen Mark, in seasonal outdoor sporting activities such as

fishing, hiking in the woods, at the beach and biking in exclusive leisure time locations such as

the Hamptons, in many cases posed in front of, waving or wrapped in American flags.  Other

videos feature USPA fashion shows featuring a large Double Horsemen Mark as the backdrop

for the runway.  Several of these videos use the Double Horsemen Mark, and at least one video

displays the mark fixed in the corner of the frame for the duration of the video.  Examples of

these videos are being provided to the Court along with this Complaint as Exhibit G.

### D.   Defendants' Use of the Double Horsemen Mark for Retail Store Services Violates the 2012 Injunction

51.     Defendants' use of any Double Horsemen Mark in connection with Retail Store

Services is in violation of the 2012 Injunction, which, among other things, enjoins Defendants

from: (i) "Using the PRL marks or any other name or mark, including the image of one or more

mounted polo players, that constitutes a colorable imitation of or is confusingly similar to PRL's

Polo Player Logo . . . or "POLO" word mark in connection with the sale or offering for sale of

any goods or rendering of any services;" and (ii) "Using for any commercial purpose whatsoever

any symbol, logo, trade name, trademark, or trade dress which is calculated to or has the effect of

representing that the products or services of or licensed by the USPA are associated with,

sponsored, endorsed, or authorized by, or are in any way connected or associated with the PRL

Parties or any entity affiliated with them."  Ex. D., ¶ 3.

52.     The Double Horsemen Mark currently being used in connection with Defendants'

Retail Store Services is virtually identical to that enjoined by the 2012 Injunction (regarding

fragrances) and the continued use of which mark on sunglasses was later held contemptuous by

this Court in the 2013 Order.  As Judge Sweet previously held, the Double Horsemen Mark

constitutes a colorable imitation of, and is confusingly similar to, PRL's Polo Player Logo, and

also has the effect of representing that the Defendants' products are associated with, endorsed,

sponsored, or authorized by PRL.

53.     Judge Sweet found that the Double Horsemen Mark "gives the front—mallet

raised—horseman more visual prominence," and both horsemen "share the same directional

perspective and overlap to a degree that it can be difficult to discern if there is one horse or two."

In addition, just as found in prior litigation, USPA's bad faith intent "to capitalize on PRL's

reputation and good will can be inferred from its decision to adopt a mark that is so strikingly

similar to the PRL Polo Player Logo." *Polo Ass'n.*, 800 F. Supp.2d at 536; *see* § IV.C, *supra*.

## VI.    DEFENDANTS' INFRINGING USE OF THE
## DOUBLE HORSEMEN MARK ON BEDDING

54.     Defendants are also using the Double Horsemen Mark in connection with bedding

and other products that fall within Class 24 of the International Class Schedule (collectively

referred to herein as "Bedding").  Bedding is not among the categories of goods covered by the

parties' Settlement Agreement.  These products are being offered for sale on e-commerce sites,

including Amazon.com and Sears.com, and at USPA stores, including the new retail location in

SoHo in New York City.  Examples of the Double Horsemen Mark being used on Bedding are

attached hereto as Exhibit H.

55.     By using the Double Horsemen Mark in connection with the sale of Bedding,

Defendants intend to cause confusion and deceive the public, and take advantage of the good will

associated with the PRL Marks, in willful disregard of PRL's rights.  Defendants' activities are

likely to lead to and result in consumer confusion, mistake, and/or deception, and are likely to

cause consumers and the public to believe that PRL has produced, sponsored, authorized,

licensed or otherwise approved Defendants' use of the Double Horsemen Mark on Bedding.

56.     In addition, the Double Horsemen Mark currently being used on Bedding is

virtually identical to the mark enjoined as infringing by the 2012 Injunction and which was

enjoined as contemptuous by this Court in its 2013 Order related to sunglasses.

## VII.    DEFENDANTS' USE OF THE SOLID<br>DOUBLE HORSEMEN MARK ON SPECIFIED PRODUCTS

57.     Defendants are using the Solid Double Horsemen Mark, as pictured below, in the

marketing and sale of the Specified Products (as defined in ¶ 22, *supra*).



58.     Defendants' ongoing use of the Solid Double Horsemen Mark is in direct

violation of the 2005 Judgment which prohibits USPA and its licensees from using a Solid

Double Horsemen Mark in connection with the sale of the Specified Products without the text

"U.S.P.A." appearing directly below the logo.

59.     Examples of the Solid Double Horsemen Mark now being used by Defendants are

set forth below:



60.     The Defendants' current use of the Solid Double Horsemen Mark does not comply with the limitations set forth in prior injunctions and constitutes yet another blatant attempt to capitalize on PRL's brand identity.

61.     The versions of the Solid Double Horsemen Mark Defendants are currently using feature a front horseman with mallet raised (just like the PRL Polo Player Logo).  The mark does not show a distinct, outlined second player, particularly when reduced in size.  Instead, both horsemen blend together as one solid mass.  This merging of the two is particularly apparent when viewed from any distance, including the distance from which a casual observer would likely view the mark.  The lack of definition distinguishing the two horsemen obscures whether there are one or two horsemen.

62.     Examples of different iterations of the Solid Double Horsemen Mark being used on the Specified Products include, but are not limited to:

- •     An all-metallic Solid Double Horsemen Mark found on watches, an example of which is also attached hereto as Exhibit I.



This mark has no definition between the two horsemen, and no contrasting colors between the two horsemen, as required for the outlined Double Horsemen Mark, and does not bear "U.S.P.A." directly under the logo. It appears solid because it is all the same color. It is impossible to distinguish between the two riders or the two horses, and the mark looks like a single horsemen.

- An embroidered Solid Double Horsemen Mark found on various apparel items, using monochrome thread.



An example is also attached hereto as Exhibit J. The mark does not have sufficient distinction between the two riders. The front horseman, with its mallet upraised, is completely solid, and the rear horseman is almost entirely solid. It is impossible to make out the boundaries of the rear horse.

- An embossed Solid Double Horsemen Mark found on products including but not limited to shoes, belts, bags, and watch cases.



An example is also attached hereto as Exhibit K. This mark has no definition and no contrasting colors distinguishing the two horsemen or their horses. It appears as a solid mark because it is all one color.

- A crystal Solid Double Horsemen Mark found on shirts, an example of which is also attached hereto as Exhibit L.



This mark, which mimics a crystal Polo Player Logo used by PRL, consists of crystals and contains no discernible definition between the two horsemen or their horses.

63.      Tellingly, such use of the Solid Double Horsemen Mark on the Specified

Products, without "U.S.P.A." below the mark, does not even comply with USPA's own internal

guidelines. The U.S. Polo Association Brand Rulebook released in June 2010 (the "Rulebook")

contains guidelines disseminated internally by USPA for developing products consistent with the

USPA brand, and purports to be a "reference for all brand applications." Excerpts of the

Rulebook are attached hereto as Exhibit M. The Rulebook references the Settlement Agreement

and notes the restrictions by which USPA and its licensees must abide. Ex. M, § 2.2. It states

that "[t]here are only two versions of the Double Horsemen Mark (DHM) authorized for use,"

*i.e.*, the outlined mark and the solid mark with the letters USPA below it allowed by Judge

Daniels. *Id.*, § 2.4. The Rulebook requires that, with respect to the outlined mark,

> The front player and horse **must** be distinguishable from the back
> player and horse by contrasting colors (**light and dark**), clarity
> and definition of line.

64.     The Rulebook also provides minimum size requirements for the outlined Double

Horsemen Mark. Ex. M, § 2.3. With respect to the solid double horsemen mark with the USPA

text below it, the Rulebook provides:

> The Solid DHM must have the letters USPA below it.
>
> When embossing, stamping, or using any other imprinting
> technique on hard material like leather and metal, if it is not
> obviously compliant on all counts, than we recommend using
> USPA under the mark, as in (b) above, so as not to violate the PRL
> Settlement Agreement.
>
> Scale does make a difference. The larger the mark is, the easier it
> is to show clarify, contrast and definition of line. If you cannot
> meet this criteria, include USPA under the mark.
>
> . . .
>
> Minimum size exceptions may be granted on certain products such
> as eyeglasses or watches, and some leather products, e.g. belts, on
> a case-by-case basis, but at the sole discretion of U.S.P.A.
> Properties.

The Rulebook provides examples of unacceptable marks, including the below:



No contrasting color
should have been used

Ex. M, § 2.4.  In addition, the Rulebook directs that the Solid Double Horsemen Mark should never be used alone.  *Id.*

65.     Despite the USPA's own interpretation of its obligations, however, Defendants are using the Solid Double Horsemen Mark on a variety of the Specified Products including women's, men's, and children's apparel, shoes, bags, watches, leather goods, and other accessories.  Examples of products bearing the Solid Double Horsemen Mark that are being sold at various retailers, including USPA stores managed by JRA and through e-commerce websites, are attached hereto as Exhibit N.

66.     The Defendants' use of the Solid Double Horsemen Mark on the Specified Products is a violation of the 2005 Judgment because the Solid Double Horsemen Mark is virtually identical to the Solid Double Horsemen Mark prohibited by the 2005 Judgment, particularly when rendered in small scale and/or viewed from any distance.

## VIII.   DEFENDANTS' BAD FAITH VIOLATIONS OF THIS COURT'S PRIOR ORDERS

67.     At the time of the 2000 Apparel Litigation, USPA purported that the purpose of its licensing program was to promote the sport and to raise revenue for the sport of polo.  The former Chair of USPA's promotion committee, who was credited with the idea to begin selling licensed product, testified that it was intended to obtain "additional funds in the USPA to promote the sport," and that USPA Properties, Inc., was designed to raise money and support the

not-for-profit USPA in the same way that licensed Major League Baseball products raise money and support the sport of Major League Baseball. Excerpts from the trial transcript in the 2000 Apparel Litigation are attached hereto as Exhibit O.

68.     Despite its stated purpose to promote the sport of polo, USPA, with the help of JRA (its master licensee in the United States), has become a profit-making retail enterprise selling fashion apparel and many other categories of goods worldwide. Indeed, it has been reported that the vast majority of USPA's revenue, which is derived from licensing royalties it receives via its wholly-owned subsidiary, USPA Properties, Inc., is not used to promote or support the sport of polo.

69.     USPA's website claims that its "products are sold through [USPA's] licensing program in over 135 countries at independent retail stores, department stores and U.S. Polo Assn. brand stores," and that the "U.S. Polo Assn. brand carries clothing for men, women and children, as well as accessories, luggage, watches, shoes, home furnishings and more." *See* www.uspoloassn.com/pages/about-us (last visited on February 5, 2014).

70.     While Plaintiff at this time does not seek recourse in this Complaint for trade dress infringement, unfair competition, trademark infringement, or dilution arising from Defendants' use of the Double Horseman Mark in connection with the Specified Products, and preserves its rights with respect to any such claims, Defendants' behavior highlights their bad faith intentions to trade on the good will associated with the PRL Marks, in clear violation of this Court's prior orders and judgments.

71.     For example, in July 2005, PRL began promoting and selling apparel featuring a solid, larger-sized version of its famous Polo Player Logo (the "Big Pony Logo"). PRL has used the Big Pony Logo in connection with numerous products, including men's and women's

collared shirts, some of which feature a number on the right outer sleeve. After PRL began using the Big Pony Logo, Defendants began selling apparel containing a solid, larger Double Horsemen Mark, of nearly identical scale to the Big Pony Logo. Defendants also featured their copycat larger Double Horsemen Mark on products which mimicked those used on PRL shirts featuring the Big Pony Logo, and included a number on the right outer sleeve. Examples of PRL's and Defendants' products are attached hereto as Exhibit P.

72. Similarly, when PRL has introduced other special versions of its Polo Player Logo on apparel, the Defendants have immediately started using corresponding versions of the Double Horsemen Mark on its products:

- In February 2008, PRL began using a multi-colored, embroidered version of its Polo Player Logo. Defendants subsequently began selling the same style products bearing a multi-colored, embroidered Double Horsemen Mark that, like the PRL logo, included a brown horse and polo players with white pants and primary-colored shirts. For example, as of the date of this Complaint, at least two styles of "Multi-Color Big Logo Polo Shirts" are available for sale via USPA's e-commerce website. Examples of PRL's and Defendants' products are attached as Ex. Q.

- In March 2001, PRL began using a solid pink version of its Polo Player Logo. This special logo is used solely for products relating to breast cancer awareness, and a portion of the sales proceeds for such products is donated to charity. After PRL introduced its pink Polo Player Logo, Defendants began selling apparel bearing a solid pink Double Horsemen Mark. There is no evidence that USPA is donating any proceeds from the sales of such products. Examples of PRL's and Defendants' products are attached as Ex. R.

73. In addition to copying special versions of PRL's Polo Player Logo, Defendants have also used the Double Horsemen Mark on products which copy specific product designs used by PRL. For example:

- PRL designed, promoted and sold shirts featuring a dip dye coloring and a Big Pony Logo on the left chest. One PRL shirt featured navy and white dip dye and a red Big Pony Logo. Upon information and belief, Defendants thereafter manufactured and sold dip dye polo shirts featuring a large Double Horsemen Mark, including a navy, white, and red dip dye shirt of the same style, featuring a

solid red large Double Horsemen Mark.  Examples of PRL's and Defendants' products are attached as Ex. S.

- PRL designed, promoted and sold shirts featuring several different flag designs, each featuring the flag of a country on the right chest, the name of the country below the flag, and a Big Pony Logo on the left chest.  For example, one PRL shirt was royal blue with the Italian flag and the word "Italy" on the right chest, a white Big Pony Logo on the left, and a white number on the sleeve.  Upon information and belief, Defendants thereafter sold flag shirts, including the same style royal blue shirt with the Italian flag and the word "Italy" on the right chest, a white Double Horsemen Mark on the left chest, and a white number on the right sleeve.  Examples of PRL's and Defendants' products are attached as Ex. T.

- PRL designed, promoted, and sold shirts featuring wide diagonal stripes across the front of the shirt from shoulder to waist, including a white shirt with navy blue and red diagonal stripes and a navy blue Big Pony Logo on the right chest.  Upon information and belief, Defendants thereafter sold the same style shirts with diagonal stripes and a large Double Horsemen Mark, including a white polo shirt with navy blue and red diagonal stripes across the front of the shirt from shoulder to waist, and a navy blue Solid Double Horsemen Mark.  Examples of PRL's and Defendants' products are attached as Ex. U.

- PRL designed, promoted and sold shirts featuring large roman numerals, a PRL logo featuring two mounted polo players viewed from the side on the left chest, and a number on the right chest, including a long-sleeve navy shirt featuring "LXVII" in white text on the front middle of the shirt, a white "3" on the right chest, and a solid red horseman logo on the right chest.  Upon information and belief, USPA thereafter sold a line of the same style shirts with roman numerals, a Double Horsemen Mark, and numbers, including a navy blue polo shirt featuring "XVIII" in white text on the front middle of the shirt, a white "3" on the right chest, and a solid red Double Horsemen Mark on the left chest.  Examples of PRL's and Defendants' products are attached as Ex. V.

- PRL designed, promoted and sold a navy blue puffy winter coat featuring red stripes down the sleeves, a red stripe at each cuff, a rectangular licensed Team USA Olympic logo on the right chest and a white Big Pony Logo on the left chest.  Upon information and belief, Defendants thereafter sold a navy blue puffy winter coat that also featured red stripes down the sleeves, a red stripe at each cuff, a rectangular "Team USPA" logo which mimics the Olympic USA Logo on the right chest, and a solid white large Double Horsemen Mark on the left chest.  Examples of PRL's and Defendants' products are attached as Ex. W.

- PRL designed, promoted and sold a navy blue PRL shirt featuring a coat-of-arms flag design on the right chest, a white "3" on the sleeve, a Big Pony Logo on the left chest, and a red placket. Upon information and belief, Defendants thereafter sold the same style navy blue shirt with a coat-of-arms flag design on the right chest, a solid white large Double Horsemen Mark on the left chest, a white "3" on

the sleeve, and a red placket.  Examples of PRL's and Defendants' products are attached as Ex. X.

## CLAIMS FOR RELIEF

**I.     CONTEMPT OF THE 2012 INJUNCTION
WITH RESPECT TO RETAIL STORE SERVICES**

74.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 73, as if fully set forth herein.

75.     Defendants' use of the Double Horsemen Mark in connection with Retail Store Services is in violation of the 2012 Injunction entered by Judge Sweet, a copy of which is attached here as Exhibit D.

76.     The 2012 Injunction provides that Defendants are enjoined from "[u]sing the PRL marks or any other name or mark, including the image of one or more mounted polo players, that constitutes a colorable imitation of or is confusingly similar to PRL's Polo Player Logo . . . or "POLO" word mark in connection with the sale or offering for sale of any goods or rendering of any services."  It also enjoins Defendants from "[u]sing for any commercial purpose whatsoever any symbol, logo, trade name, trademark, or trade dress which is calculated to or has the effect of representing that the products or services of or licensed by the USPA are associated with, sponsored, endorsed, or authorized by, or are in any way connected or associated with the PRL Parties or any entity affiliated with them."

77.     The 2012 Injunction is clear and unambiguous.

78.     Upon information and belief, Defendants have used the Double Horsemen Mark, the words U.S. Polo Assn. and/or other marks constituting colorable imitations of PRL's registered trademarks in connection with Retail Store Services.

79.     Upon information and belief, Defendants made millions of dollars in sales as a result of its conduct described in paragraphs 1 through 78 above.

80.     Defendants' willful violation of the 2012 Injunction has caused damage to Plaintiff.

## II.     CONTEMPT OF THE 2012 INJUNCTION WITH RESPECT TO BEDDING

81.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80, as if fully set forth herein.

82.     Defendants' use of any Double Horsemen Mark in connection with the sale of Bedding is in violation of the 2012 Injunction entered by Judge Sweet, a copy of which is attached here as Exhibit D.

83.     The 2012 Injunction provides that Defendants are enjoined from "[u]sing the PRL marks or any other name or mark, including the image of one or more mounted polo players, that constitutes a colorable imitation of or is confusingly similar to PRL's Polo Player Logo . . . or "POLO" word mark in connection with the sale or offering for sale of any goods or rendering of any services." It also enjoins Defendants from "[u]sing for any commercial purpose whatsoever any symbol, logo, trade name, trademark, or trade dress which is calculated to or has the effect of representing that the products or services of or licensed by the USPA are associated with, sponsored, endorsed, or authorized by, or are in any way connected or associated with the PRL Parties or any entity affiliated with them."

84.     The 2012 Injunction is clear and unambiguous.

85.     Upon information and belief, Defendants have sold significant quantities of Bedding bearing the Double Horsemen Mark or other marks constituting colorable imitations of PRL's registered trademarks.

86.     Upon information and belief, Defendants made many millions of dollars in sales as a result of its conduct described in paragraphs 1 through 85 above.

87.     Defendants' willful violation of the 2012 Injunction has caused damage to

Plaintiff.

## III.    WILLFUL INFRINGEMENT OF THE PRL MARKS WITH RESPECT TO RETAIL STORE SERVICES IN VIOLATION OF SECTION 43 OF THE LANHAM ACT, 15 U.S.C. § 1125

88.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

87, as if fully set forth herein.

89.     Plaintiff is the owner of all rights, title and interest in the PRL Marks with respect

to Retail Store Services in the U.S.  Plaintiff and its parent, affiliated companies and their

predecessors in interest, are using and have used the PRL Marks in U.S. commerce in connection

with Retail Store Services for many years and used the PRL Marks long before Defendants

began use of the Double Horsemen Marks.

90.     Defendants have infringed the PRL Marks by unauthorized use of a Double

Horsemen Mark and/or the PRL Marks on and in connection with the provision of Retail Store

Services within Class 35 of the International Class Schedule in commerce without PRL's

permission or consent.

91.     Defendants' use of a Double Horsemen Mark and/or the PRL Marks has been

committed and is committed with the intent to cause confusion and deceive the public, and take

advantage of the good will associated with the PRL Marks.  The Defendants' conduct is

undertaken in willful disregard of PRL's rights.

92.     Defendants' activities are likely to lead to and result in consumer confusion,

mistake, or deception, and are likely to cause consumers and the public to believe that PRL has

produced, sponsored, authorized, licensed or otherwise approved Defendants' use of a Double

Horsemen Mark and/or the PRL Marks.

93.     PRL has been and will continue to be irreparably harmed unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

94.     In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using any Double Horsemen Mark, the PRL Marks, and any marks confusingly similar to the PRL Marks in connection with Retail Store Services.

## IV.     WILLFUL INFRINGEMENT OF THE PRL MARKS WITH RESPECT TO BEDDING IN VIOLATION OF SECTION 32 OF THE LANHAM ACT, 15 U.S.C. § 1114

95.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 94, as if fully set forth herein.

96.     Defendants have infringed the PRL Marks by unauthorized use of a Double Horsemen Mark and/or the PRL Marks on and in connection with the promotion and sale of Bedding within Class 24 of the International Class Schedule in interstate commerce without PRL's permission or consent.

97.     Defendants' use of a Double Horsemen Mark and/or the PRL Marks has been committed and is committed with the intent to cause confusion and deceive the public, and take advantage of the good will associated with the PRL Marks.  The Defendants' conduct is undertaken in willful disregard of PRL's rights.

98.     Defendants' activities are likely to lead to and result in consumer confusion, mistake, or deception, and are likely to cause consumers and the public to believe that PRL has produced, sponsored, authorized, licensed or otherwise approved Defendants' use of a Double Horsemen Mark and/or the PRL Marks.

99.     PRL has been and will continue to be irreparably harmed unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

100.    In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using any Double Horsemen Mark, the PRL Marks, and any marks confusingly similar to the PRL Marks on Bedding.

## V.    DILUTION WITH RESPECT TO RETAIL STORE SERVICES UNDER SECTION 43(C) OF THE LANHAM ACT, 15 U.S.C. § 1125(C)

101.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100, as if fully set forth herein.

102.    The PRL Marks are registered on the U.S. Principal Register, are each widely recognized by the general consuming public as a designation of source for the goods and services of Plaintiff, and each qualify as a famous mark pursuant to Section 43(c)(2) of the Lanham Act.

103.    Defendants are making unauthorized trademark use of the PRL Marks, the Double Horsemen Mark, or other marks confusingly similar to the PRL Marks, as marks or trade names in connection with the provision of services within Class 35 of the International Class Schedule in commerce, which use commenced long after each of the PRL Marks became famous.

104.    Defendants willfully traded and are willfully trading on Plaintiff's reputation in the PRL Marks which is likely to cause the dilution of the distinctive quality of the world famous PRL Marks by creating a likelihood of association with the PRL Marks and which is likely to impair the distinctiveness of the PRL Marks.  Defendants actions are also likely to cause dilution by tarnishment by harming the reputation of the PRL Marks.

105.    Defendants committed these actions willfully and with the intention to create an association with the famous PRL Marks and to trade on the recognition and good will associated with the PRL Marks and with willful intention to harm the reputation of the famous PRL Marks.

106.     PRL has been harmed and will continue to be irreparably harmed as a result of Defendants' unlawful actions unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

107.     In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using a Double Horsemen Mark and/or the PRL Marks or any marks confusingly similar to the PRL Marks in connection with Retail Store Services.

## VI.   DILUTION WITH RESPECT TO BEDDING UNDER SECTION 43(C) OF THE LANHAM ACT, 15 U.S.C. § 1125(C)

108.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 107, as if fully set forth herein.

109.     The PRL Marks are registered on the U.S. Principal Register, are each widely recognized by the general consuming public as a designation of source for the goods and services of Plaintiff, and each qualify as a famous mark pursuant to Section 43(c)(2) of the Lanham Act.

110.     Defendants are making unauthorized trademark use of the PRL Marks, the Double Horsemen Mark, or other marks confusingly similar to the PRL Marks, as marks or trade names in connection with the promotion and sale of Bedding within Class 24 of the International Class Schedule in interstate commerce, which use commenced long after each of the PRL Marks became famous.

111.     Defendants willfully traded and are willfully trading on Plaintiff's reputation in the PRL Marks which is likely to cause the dilution of the distinctive quality of the world famous PRL Marks by creating a likelihood of association with the PRL Marks and which is likely to impair the distinctiveness of the PRL Marks.  Defendants actions are also likely to cause dilution by tarnishment by harming the reputation of the PRL Marks.

112.     Defendants committed these actions willfully and with the intention to create an association with the famous PRL Marks and to trade on the recognition and good will associated with the PRL Marks and with willful intention to harm the reputation of the famous PRL Marks.

113.     PRL has been harmed and will continue to be irreparably harmed as a result of Defendants' unlawful actions unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

114.     In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using a Double Horsemen Mark and/or the PRL Marks or any marks confusingly similar to the PRL Marks on Bedding.

## VII.    UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN OR SPONSORSHIP WITH RESPECT TO RETAIL STORE SERVICES UNDER SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(A)

115.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 114, as if fully set forth herein.

116.     Defendants' use of a Double Horsemen Mark and/or the PRL Marks on and in connection with the provision of Retail Store Services within Class 35 of the International Class Schedule in interstate commerce without PRL's permission or consent constitutes unfair competition and willful false designation of origin and false and misleading description and representation of fact, which is likely to cause confusion or mistake, or to deceive the relevant purchasing public as to the origin or sponsorship of Defendants' products and services.

117.     PRL has been harmed and will continue to be irreparably harmed as a result of Defendants' willful and unlawful actions unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

118.    In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using a Double Horsemen Mark and/or the PRL Marks or any marks confusingly similar to the PRL Marks in connection with Retail Store Services.

## VIII.  UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN OR SPONSORSHIP WITH RESPECT TO RETAIL STORE SERVICES AND BEDDING UNDER SECTION 43(A) OF THE LANHAM ACT, 15 U.S.C. § 1125(A)

119.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 118, as if fully set forth herein.

120.    Defendants' use of a Double Horsemen Mark and/or the PRL Marks on and in connection with the promotion and sale of Bedding within Class 24 of the International Class Schedule in interstate commerce without PRL's permission or consent constitutes unfair competition and willful false designation of origin and false and misleading description and representation of fact, which is likely to cause confusion or mistake, or to deceive the relevant purchasing public as to the origin or sponsorship of Defendants' products and services.

121.    PRL has been harmed and will continue to be irreparably harmed as a result of Defendants' willful and unlawful actions unless Defendants are enjoined from their unlawful conduct. PRL has no adequate remedy at law.

122.    In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using a Double Horsemen Mark and/or the PRL Marks or any marks confusingly similar to the PRL Marks on Bedding.

## IX.  COMMON LAW UNFAIR COMPETITION WITH RESPECT TO RETAIL STORE SERVICES

123.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 122, as if fully set forth herein.

124.     Defendants' unlawful appropriation of PRL's rights in the PRL Marks through use of a Double Horsemen Mark and/or the PRL Marks in connection with the provision of services within Class 35 of the International Class Schedule was intended to capitalize for Defendants' own pecuniary gain on the good will and excellent reputation of Plaintiff and its PRL Marks, which PRL has expended substantial time, resources and effort to obtain. Defendants have been unjustly enriched and are benefiting from property rights that rightfully belong to PRL.

125.     PRL has been harmed and will continue to be irreparably harmed as a result of Defendants' unlawful actions unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

126.     In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using a Double Horsemen Mark and/or the PRL Marks and any marks confusingly similar to the PRL Marks in connection with Retail Store Services.

## X.     COMMON LAW UNFAIR COMPETITION WITH RESPECT TO BEDDING

127.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 126, as if fully set forth herein.

128.     Defendants' unlawful appropriation of PRL's rights in the PRL Marks through use of a Double Horsemen Mark and/or the PRL Marks in connection with the promotion and sale of Bedding within Class 24 of the International Class Schedule was intended to capitalize for Defendants' own pecuniary gain on the good will and excellent reputation of Plaintiff and its PRL Marks, which PRL has expended substantial time, resources and effort to obtain. Defendants have been unjustly enriched and are benefiting from property rights that rightfully belong to PRL.

129.   PRL has been harmed and will continue to be irreparably harmed as a result of Defendants' unlawful actions unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

130.   In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using a Double Horsemen Mark and/or the PRL Marks and any marks confusingly similar to the PRL Marks on Bedding.

## XI.   DILUTION WITH RESPECT TO RETAIL STORE SERVICES UNDER NEW YORK GENERAL BUSINESS LAW § 360-1 ET SEQ.

131.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 130, as if fully set forth herein.

132.   The PRL Marks are distinctive.  Defendants' use of a Double Horsemen Mark and/or the PRL Marks in connection with the provision of Retail Store Services within Class 35 of the International Class Schedule harms or is likely to harm PRL's business reputation and dilutes or is likely to dilute the distinctive quality of the world famous PRL Marks.

133.   PRL has been harmed and will continue to be irreparably harmed as a result of Defendants' unlawful actions unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

134.   In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using a Double Horsemen Mark and/or the PRL Marks or any marks confusingly similar to the PRL Marks in connection with Retail Store Services.

## XII.   DILUTION WITH RESPECT TO BEDDING UNDER NEW YORK GENERAL BUSINESS LAW § 360-1 ET SEQ.

135.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 134, as if fully set forth herein.

136.    The PRL Marks are distinctive.  Defendants' use of a Double Horsemen Mark and/or the PRL Marks in connection with the promotion and sale of Bedding within Class 24 of the International Class Schedule harms or is likely to harm PRL's business reputation and dilutes or is likely to dilute the distinctive quality of the world famous PRL Marks.

137.    PRL has been harmed and will continue to be irreparably harmed as a result of Defendants' unlawful actions unless Defendants are enjoined from their unlawful conduct.  PRL has no adequate remedy at law.

138.    In light of the foregoing, PRL is entitled to an injunction prohibiting Defendants from using a Double Horsemen Mark and/or the PRL Marks or any marks confusingly similar to the PRL Marks on Bedding.

## XIII.  CONTEMPT OF THE 2005 JUDGMENT
## WITH RESPECT TO THE SPECIFIED PRODUCTS

139.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 138, as if fully set forth herein.

140.    Defendants' use of the Solid Double Horsemen Mark on the Specified Products is in violation of the 2005 Judgment entered by Judge Daniels, a copy of which is attached here as Exhibit C.  The 2005 Judgment provides that Defendants are "permanently enjoined from making any such use of the 'solid double horsemen' mark" in connection with products that fall within Class 14 (solely limited to watches), Class 18, Class 25, and Class 28 (solely limited to products that pertain to the sport of polo) of the International Schedule of Classes of Goods and Services.

141.    Defendants' Solid Double Horsemen Mark is rendered using monochromatic thread, embossing, engraving, or other methods that reflect no distinction between the two players, or make the two players appear as one.  The Solid Double Horsemen Mark is rendered

in a size such that from any reasonable distance it appears to be one horsemen. Accordingly, whether through color, size, or both, the Solid Double Horsemen Mark currently being used by Defendants is in direct violation of the 2005 Judgment.

142.    The 2005 Judgment is clear and unambiguous.  The USPA Rulebook demonstrates that Defendants are aware that its use of the Solid Double Horsemen Mark is prohibited by the 2005 Judgment.  Defendants have willfully and deliberately used a Solid Double Horsemen Mark in a clear and intentional violation of the 2005 Judgment.

143.    Upon information and belief, Defendants have sold significant quantities of the Specified Products bearing the Solid Double Horsemen Mark or other marks constituting colorable imitations of PRL's registered trademarks.

144.    Upon information and belief, Defendants made sales of many millions of dollars as a result of its conduct described in paragraphs 1 through 143 above.

145.    Defendants' willful violation of the 2005 Judgment has caused damage to Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, PRL demands judgment against Defendants on the foregoing claims as follows:

  i.  Finding that Defendants are in contempt of the 2012 Injunction with respect to use of the Double Horsemen Mark in connection with Retail Store Services;

  ii.  Finding that Defendants are in contempt of the 2012 Injunction with respect to their use of the Double Horsemen Mark in connection with the promotion and sale of Bedding;

iii.    Finding that Defendants are in contempt of the 2005 Judgment with respect to use of a Solid Double Horsemen Mark in connection with the promotion and sale of the Specified Products;

iv.    Ordering the Defendants to submit to an accounting for the purpose of determining the Defendants' profits resulting from their violation of the 2012 Injunction and the 2005 Judgment;

v.    Ordering Defendants to pay PRL compensation, in an amount to be determined at trial, attributable to Defendants' violation of the 2012 Injunction and the 2005 Judgment;

vi.    Ordering Defendants to pay PRL compensation equal to the amount of profits derived from Defendants' violation of the 2012 Injunction and the 2005 Judgment;

vii.    Ordering Defendants to pay PRL monetary damages equal to the amount of profits Defendants derived from use of the Double Horsemen Mark in connection with Retail Store Services;

viii.    Ordering Defendants to pay PRL monetary damages equal to the amount of profits Defendants derived from the sale of Bedding bearing the Double Horsemen Mark;

ix.    Ordering Defendants to pay PRL monetary damages equal to the amount of Plaintiff's lost profits attributable to Defendants' unlawful acts;

x.    Enjoining Defendants, their agents, servants, employees, licensees, sponsors, associate, and attorneys, and all persons acting by, through, or in active concert with any of them, be permanently enjoined from using a Double Horsemen Mark, the PRL Marks, or any other name or mark, including the image of one or more mounted polo players, that constitutes a colorable imitation of or is confusingly similar to PRL's Polo Player Logo in connection with the provision of Retail Store Services, or the promotion or sale of Bedding;

xi.   Ordering Defendants to pay Plaintiff's attorneys' fees, costs, and
      expenses; and

xii.  For such other and further relief as this Court may deem just and proper.


DATED:  New York, New York                    Respectfully submitted,
        February 6, 2014

                                              KELLEY DRYE & WARREN LLP


                                              By: _____
                                                  John M. Callagy
                                                  William R. Golden, Jr.
                                                  Andrea L. Calvaruso
                                                  101 Park Avenue
                                                  New York, New York
                                                  Tel: (212) 808-7800

                                                  *Attorneys for Plaintiff*
                                                  *PRL USA Holdings, Inc.*

43